# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JAMAAL GARVIN ALEXIS, #366-494, | * |
| Petitioner, | * |
| v. | *   Civil Action No. PWG-15-87 |
| WARDEN RICHARD E. MILLER and THE ATTORNEY GENERAL OF THE STATE OF MARYLAND, | * * |
| Respondents. | * |

\*\*\*

## MEMORANDUM OPINION

Jamaal Garvin Alexis, currently confined at North Branch Correctional Institution in Cumberland, Maryland, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. The Petition challenges Alexis's 2010 conviction in the Circuit Court for Prince George's County, Maryland for second-degree murder, use of a handgun in the commission of a crime of violence, armed robbery, two counts of theft, conspiracy to commit theft, and two counts of solicitation to obstruct justice. *Id.*; State Ct. Docket 9-11, 44-46, ECF No. 4-1. Respondents filed a Response in which they sought dismissal of the Petition on the basis of non-exhaustion, ECF No. 4, and Alexis filed a Reply, ECF No. 6.

On February 9, 2018, the Court provided Alexis an opportunity to to file a reply, , explaining why his claims are not procedurally barred. ECF No. 7. Alexis sought an extension of time to file his reply (ECF No. 8), which was granted to and including April 30, 2018 (ECF No. 9), but Alexis did not file a reply. An evidentiary hearing is not necessary. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Loc. R. 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a

hearing under 28 U.S.C. § 2254(e)(2)). For the reasons that follow, Alexis's Petition is denied and dismissed, and a certificate of appealability shall not issue.

## BACKGROUND

I. <u>Factual Background</u>

In October of 2010, Alexis was tried before a jury in two consolidated cases in the Circuit Court for Prince George's County. State Ct. Docket 7-8, 42-43. The facts at Alexis's trials, as summarized by the Court of Appeals of Maryland, are:

### 1. The murder of Raymond Brown and related crimes.

> On the morning of 13 October 2006, Danielle Steele Brown and her husband, Raymond Brown, were awakened by the raucous sound of Mr. Brown's car alarm. From a window of their dwelling in the Largo area of Prince George's County, Ms. Brown observed a tow truck towing away Mr. Brown's car, a black Chrysler 300. The Browns, in an attempt to locate a sign in the community with the name of the company that occasionally towed cars parked illegally in the area, drove in Ms. Brown's car to the entrance of their community, where they saw the tow truck with the Chrysler attached. According to Ms. Brown's testimony at trial, Mr. Brown got out of the car and, as Mr. Brown approached the tow truck, a man standing next to the truck ran away. Gunfire came from the driver's side of the tow truck. Mr. Brown fell to the ground, injured. The tow truck drove away with the Chrysler. Mr. Brown was taken to a local hospital where he died as a result of a gunshot wound to his chest.

> Later that day, law enforcement officers recovered the Chrysler, which had been abandoned (sans tires and with a broken door window on the driver's side), as well as an abandoned, stolen Snatchman tow truck with a broken door window on the driver's side as well. Inside the cabin of the tow truck, the officers found a cartridge casing. When the officers "dusted" the vehicles for fingerprints, they were able to "lift" a latent fingerprint belonging to Neiman Marcus Edmonds from the hood of the Chrysler. Corroborating Edmonds's involvement in the events of October 13, approximately six months after the shooting, Ms. Brown identified Edmonds from a photographic array as the man who had been standing next to the tow truck on the night of her deceased husband's shooting and ran.

> According to the testimonies of Edmonds and the other State's witnesses at Alexis's trial, Alexis had a history of stealing cars using a Snatchman tow truck for the purpose of stripping the tires off the cars to sell the rims, and then abandoning the car. Some of these witnesses claimed that Alexis admitted to shooting and killing Brown. Edmonds testified that Alexis, Ennels, and he drove

2

to Largo to steal a car in the late evening of 12 October 2006.  Alexis drove a stolen Snatchman tow truck.  Bobby Ennels drove his car, with Edmonds asleep in the back seat.  Alexis backed the tow truck into the Browns' driveway, put the forks under the Chrysler 300 (which had 22-inch rims), and picked it up.  When Alexis picked up the Chrysler, the car's alarm sounded.  Alexis drove the truck (with the car attached) to the front of the community, where Ennels broke the Chrysler's door window on the driver side and popped the hood so that Edmonds could disable the alarm.

As Edmonds disabled the alarm, another car approached.  When a man stepped out of the second car, Edmonds ran to Ennels's car.  Edmonds testified that, as he ran to the car, he heard a "slight pow" and glass breaking.  Ennels and Edmonds drove to a previously agreed upon meet-up location, where they found Alexis with the tow truck (with a newly broken window) and the Chrysler attached. Edmonds asked Alexis if the man in the second car shot at them; Alexis did not reply.  The trio stripped the Chrysler of its tires, "wiped down" the car and the tow truck, and abandoned both vehicles.  The next day, according to Edmonds's testimony, Alexis, Edmonds, and Ennels were at the house of Brian Barnes (a mutual acquaintance) when Alexis told Edmonds that he shot Brown (the man in the second car) because he saw Brown get out of the car with something in his hand.

On 27 March 2008, the State charged Petitioner, Jamaal Garvin Alexis, with murder, carjacking, and related crimes with respect to Brown.

## 2.  The murder of Bobby Ennels.

Also, according to Edmonds's testimony, Ennels was present at Barnes's house on 14 October 2006 during the conversation in which Alexis admitted to shooting Brown the previous day.  According to Edmonds, this conversation led Ennels to "freak[ ] out," which, in turn, caused Alexis to worry that Ennels might "snitch."  Edmonds asserted to Alexis that Ennels would not do that. Approximately one month later, Alexis asked Edmonds if he thought Alexis should kill Ennels if Ennels tried to snitch.  Edmonds reaffirmed his confidence in Ennels.  Nevertheless, Alexis suggested that Edmonds get Ennels drunk one night and in a car, pull up to a stop light, and let Alexis "do the rest."  Edmonds refused.

On 3 October 2008, Alexis, while detained at the Prince George's County Detention Center, called Deaundrey Shropshire, who was raised with the Alexis family and was the current roommate of Alexis's brother, Rashadd.  Alexis asked him, "What's going on with my M?" Shropshire responded, "You still haven't told me what you want me to do with that [guy]."

Three days later, on 6 October 2008, according to the State's witness, Ms. Frances Lammons, Ennels, Anthony Cash, III, and Lammons drove to a location on Nalley Road in the County.  Upon arrival, Ennels called someone and stated,

3

"You all can come on down . . . ." Approximately two minutes later, two men approached the car. Lammons testified that one man was "brown skin[ned with a] short haircut," and the second man was "brown skin[ned] with dreads." According to Lammons, Ennels told the men, "You all don't have to worry about nothing[;] It's okay. It's cool." Whereupon, the man with the short haircut shot Ennels. Upon being shot, Ennels put the car into reverse and crashed into a tree. Lammons and Cash got out of the car and ran. Lammons was shot in the elbow while fleeing.

Ennels was found dead in the driver's seat of the car. Cash was found dead, as a result of gunshot wounds to the back, forearm, and knee, in the driveway of a nearby home at 406 Nalley Road. In a neighboring house at 404 Nalley Road, law enforcement officers found a black skull cap, which contained a mixed DNA profile. Analysts determined later that Alexis's brother, Rashadd Alexis, was the major contributor to the DNA on the skullcap.

Officer Juan Nolasco testified that, on the morning of the Ennels-Cash murders, around 1:00 AM, he observed two vehicles speeding from the area of Nalley Road where the bodies of Ennels and Cash were found later. The Officer stopped one of the vehicles, a Buick Regal, registered to Shropshire. The driver of the stopped vehicle was Rashadd Alexis, who, according to Officer Nolasco, was very nervous and appeared to have blood on his shirt. Rashadd Alexis was released at that time, pursuant to an order from a detective at the scene of the shooting. Shortly thereafter, while Lammons was in hospital, the Prince George's County Police Department showed her a photographic array. She selected a picture of Barnes as someone who looked familiar to her and as a person that "resembled" a man present at the Nalley Road shootings. Lammons was shown a picture of Rashadd also, but could not identify or recognize him.

As part of the investigation of Cash's and Ennels's murders, law enforcement officers discovered that the last call to Ennels's cellular telephone before his murder was from a telephone number associated with a prepaid telephone purchased in Landover, approximately a mile from Rashadd Alexis's house. Phone records disclosed that only thirteen telephone calls were made from this particular number. All thirteen calls were made to Ennels's cellular telephone between 23 September 2008 and 7 October 2008, the day of Ennels's murder. Additionally, law enforcement officers discovered that the calls utilized cellular telephone towers located near Swan Terrace, where Rashadd Alexis's and Petitioner's aunt lived and a half mile from where Rashadd's girlfriend lived.

### 3. Jalloh, the jailhouse informant.

Amadu Sulamon Jalloh, an inmate with pending criminal charges, was incarcerated with Jamaal Alexis and Donnell Hunter (a/k/a "Fat Rat") at the Prince George's County Detention Center. Jalloh informed his attorney that he overheard conversations between Alexis and Fat Rat regarding the murder of

4

Brown and the potential killing of a witness. Jalloh's attorney arranged a meeting between Jalloh and an Assistant State's Attorney. According to Jalloh's ultimate grand jury testimony, Alexis confessed to him in jail that he murdered Brown. Moreover, Jalloh stated that, on one occasion, he heard Fat Rat tell Alexis that "the only way you can go home is to kill the witness." Jalloh testified also that, at some point after Jalloh's meeting with the Assistant State's Attorney, Alexis told Jalloh that he was going home because "[his] brother got rid of the witness." According to Jalloh, Alexis told him that three people had been shot: two men were killed and a girl was injured.

On 30 July 2009, the State charged Alexis with the murder of Bobby Ennels, a purported witness to the Raymond Brown murder, as well as with attempted murder, conspiracy to commit murder, solicitation to obstruct justice by preventing Ennels's future testimony, and solicitation to obstruct justice by retaliating against Ennels for his grand jury testimony.

*Alexis v. State*, 87 A.3d 1243, 1246-48 (Md. 2014) (footnotes omitted); *see also* State Ct. Docket 4-9.

In Case Number CT08-0504X, Alexis was convicted of second-degree murder, armed robbery, use of a handgun in the commission of a crime of violence, conspiracy to commit theft, and two counts of theft. *Alexis*, 87 A.3d at 1245. In Case Number CT09-1040B, he was convicted of two counts of solicitation to obstruct justice. *Id.* On December 14, 2010, Alexis was sentenced to serve 140 years in prison. *Id.*

II. Procedural History

Alexis appealed his judgment of conviction to the Court of Special Appeals of Maryland, raising, through counsel, the following issues:

1. Whether the trial court erred in disqualifying Alexis's defense attorney, who had previously represented Jalloh, the State's witness, although counsel had arranged for co-counsel to cross-examine Jalloh;

2. Whether the trial court erred in allowing the State to introduce the prior motions hearing testimony of Jalloh, who refused to testify at trial;

3. Whether the trial court erred in admitting the grand jury testimony of Ennels, who was deceased at the time of trial, on the ground that Alexis procured his unavailability; and

5

> 4. Whether the trial court erred by sentencing Alexis on two counts of solicitation where there was but one incitement.

*See* Pet. 2, ECF No. 1; Appellant's State Ct. Br. 2, ECF No. 4-2. In a reported opinion filed on February 27, 2013, the Court of Special Appeals affirmed Alexis's convictions. *See Alexis v. State*, 61 A.3d 104 (Md. Ct. Spec. App. 2013).

Thereafter:

> Alexis's appellate counsel filed a petition for a writ of certiorari, requesting that the Court of Appeals of Maryland further review questions 1 and 4 identified above. Alexis filed a pro se petition for a writ of certiorari, requesting that the Court of Appeals also review claims 2 and 3 identified above. The Court of Appeals granted Alexis's counseled petition for a writ of certiorari, but denied Alexis's pro se petition for a writ of certiorari. In a reported opinion filed on March 24, 2014, the Court of Appeals affirmed the judgment of the Court of Special Appeals.

Appellant's State Ct. Reply Br. 4, ECF No. 4 (citations to exhibits omitted); *see also* Cert. Pet. (with counsel) 3, ECF No. 4-6; Cert. Pet. (*pro se*) 1, ECF No. 4-7; *Alexis v. State*, 68 A.3d 286 (Md. 2013); Pet'r's Resp. 2, ECF No. 6; *Alexis*, 87 A.3d 1243. Alexis did not file a petition for writ of certiorari to the United States Supreme Court, nor did he file any post-conviction petitions. Pet. 3.

III. <u>Claims in this Court</u>

In his Petition for Writ of Habeas Corpus filed in this Court, Alexis claims that he is being detained in state custody illegally[1] and recasts the arguments he presented to the Maryland appellate courts. *See* Pet. First, Alexis alleges that his Sixth Amendment right to counsel was violated when the trial court disqualified his counsel of choice. *Id.* at 5-6. Second, he claims

---

[1] Currently, the Warden of North Branch Correctional Institution is Frank B. Bishop, Jr. Therefore, the Clerk shall be directed to amend the docket to reflect the proper Respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (stating that "in habeas challenges to present physical confinement . . . the proper respondent is the warden of the facility where the prisoner is being held").

that his Sixth and Fourteenth Amendment rights were violated when the trial court allowed the State to introduce the motions hearing testimony of Jalloh, who refused to testify at trial and whom he was unable to confront. *Id.* at 6. Third, Alexis claims that his Sixth and Fourteenth Amendment rights were violated when the trial court allowed the State to introduce the grand jury testimony of Ennels, who was deceased at the time of trial and whom he was unable to confront. *Id.* Fourth, Alexis alleges that his Eight and Fourteenth Amendment rights were violated when the trial court sentenced him "on two counts of solicitation, when there was only one incitement." *Id.*

## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447, 455 (2005). The standard is "difficult to meet," and requires federal courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted); *see also Virginia v. LeBlanc*, __ U.S. __, __, 137 S. Ct. 1726, 1728 (2017); *White v. Woodall,* __ U.S.__, __, 134 S. Ct. 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement")). A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court

of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (citation omitted). Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Further, under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010) (citation omitted). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington*, 562 U.S. at 101 (emphasis and citation omitted).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. (citation omitted).

## DISCUSSION

I. Exhaustion

As a threshold matter, a petitioner seeking habeas relief in federal court must exhaust the remedies available in state court. 28 U.S.C. § 2254(b)(1) (2012); *Rose v. Lundy*, 455 U.S. 509, 510 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(c). For a person convicted of a criminal offense in Maryland, this may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert it in an appeal to the Court of Special Appeals of Maryland and then to the Court of Appeals of Maryland by way of a petition for a writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301 (West 2011). To exhaust a claim through post-conviction proceedings, it must be raised in a petition filed in the Circuit Court and in an application for leave to appeal to the Court of Special Appeals. Md. Code Ann., Crim. Proc. § 7-109. If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted. Md. Code Ann., Cts. & Jud. Proc. § 12-202.

Respondents assert that Alexis's Petition should be dismissed because he did not raise three of his constitutional claims on appeal and did not initiate state post-conviction proceedings,

such that he has failed to exhaust state remedies as to those claims. Resp. 10. This Court provided Alexis with the opportunity to respond to the argument that his claims have not been exhausted. ECF No. 5. He did so, arguing that all of his claims had been exhausted and urging the Court not to dismiss his Petition. ECF No. 6.

I agree with Respondents and adopt their analysis:

> In the present case, Alexis claims that the state court violated his constitutional rights in four separate respects: (A) the trial court violated his Sixth Amendment right to counsel by disqualifying counsel of his choice; (B) the trial court violated his constitutional rights by allowing the State to introduce Amadu Jalloh's prior testimony when the witness refused to testify at trial; and (C) the trial court violated his constitutional rights by admitting Bobby Ennels's grand jury testimony on the ground that Alexis procured Ennels's unavailability at trial; and (D) the trial court violated his constitutional rights by sentencing him on two counts of solicitation although there was but one incitement. Paper No. 1 at 5-6. The facts underlying these claims seemingly mirror the facts underlying the claims Alexis raised on direct appeal to the Court of Special Appeals and the Court of Appeals. However, the state court record shows that only one of those claims, Claim A, was presented to the state courts as a violation of a constitutional right; the remaining three claims were presented to the state courts as violations of state law. *See* Exhibits 2-10.
>
> Alexis has not yet initiated state post conviction remedies in the Circuit Court for Prince George's County. *See* Paper No. 1; Exhibit 1. Thus, he has process available to him to exhaust state remedies, at least as to his claims that were not presented as federal claims to the state courts. Respondents do not waive the exhaustion requirement. Therefore, Alexis's current habeas petition should be dismissed unless Alexis affirmatively withdraws any asserted and unexhausted claims. *Rose v. Lundy*, 455 U.S. at 522.

Resp. 9-10 (footnote omitted).

Indeed, "[u]nder *Rose* [*v. Lundy*, 455 U.S. 509, 510, 522 (1982)], federal district courts *must dismiss* mixed habeas petitions." *Pliler v. Ford*, 542 U.S. 225, 230 (2004) (emphasis added). Because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations for filing a habeas petition in federal court, 28 U.S.C. § 2244(d)(1),

> [t]he combined effect of *Rose* and AEDPA's limitations period is that if a petitioner comes to federal court with a mixed petition toward the end of the limitations period, a dismissal of his mixed petition could result in the loss of all of his claims—including those already exhausted—because the limitations period could expire during the time a petitioner returns to state court to exhaust his unexhausted claims.

*Pliler*, 542 U.S. at 230.

Certainly, there are exceptions in which "a federal district court has discretion to stay the mixed petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition." *Stanley v. Bishop*, No. GLR-14-2028, 2017 WL 3189407, at *4 (D. Md. July 27, 2017) (citing *Rhines v. Weber*, 544 U.S. 269, 271-72, 276 (2005)). But, "stay and abeyance should be available only in 'limited circumstances' . . . . when the district court determines (1) there was good cause for the petitioner's failure to exhaust his claims first in state court," (2) the unexhausted claims are not "plainly meritless," and (3) the petitioner did not "engage[] in abusive litigation tactics or intentional delay." *Id.* at *4-5 (quoting *Rhines*, 544 U.S. at 277).

Here, Petitioner, who insists that he did exhaust his claims, has not shown good cause for his actual failure to exhaust three of his four claims. Therefore, stay and abeyance is not appropriate. This mixed petition must be dismissed. *See Pliler*, 542 U.S. at 230; *Rose*, 455 U.S. at 510.

II. Exhausted Claim

The Court could give Alexis the opportunity to voluntarily dismiss his unexhausted claims and avoid dismissal, so that he could pursue only his exhausted claim in this Court. Doing so would be futile, however, because that claim is without merit.

Alexis claims that his Sixth Amendment right to counsel was violated when the trial court disqualified his counsel of choice, Harry Tun, because Tun had previously represented Amadu

11

Jalloh, one of the State's witnesses, in a separate matter. Pet. 5-6. Alexis notes that the trial court discharged Tun even though Tun "arranged for another lawyer to cross-examine [Jalloh]." *Id.*

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The Supreme Court has recognized that

> while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *Jones v. Barnes*, 463 U.S. 745 (1983)). Therefore, the constitutional right to choose one's own counsel is circumscribed in several important respects. *Id.* For example, a defendant may not "insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government." *Id.* Trial courts are thus

> allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* at 163. "The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.* at 164. The trial court is "free to disqualify counsel even if the defendant is willing to waive a conflict of interest because of the judiciary's 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" *United States v. Basham*, 561 F.3d 302, 323 (4th Cir. 2009) (quoting *Wheat*, 486 U.S. at 160).

Prior to Alexis's trial, the State moved to disqualify Tun as defense counsel, asserting a conflict of interest between Tun's representation of Alexis and his prior representation of Jalloh, as Tun could use information he learned as Jalloh's attorney to question him in Alexis's trial. *Alexis*, 87 A.3d at 1249. On April 10, 2009, the trial court held a hearing to address various motions, including the motion to disqualify defense counsel. *Id.* at 1250. After hearing arguments from the parties, the court stated:

> THE COURT: All right. On the State's motion to strike Mr. Tun as attorney for the Defendant, for some reason, I don't know what the statistical likelihood of this happening is, the Defendant in this case and Mr. Tun's former client, Mr. Amadu Jalloh, were placed in the same jail cell at the County Correctional Center and apparently have some conversations which I believe the State intends to use, if I'm not mistaken.
>
> [ASSISTANT STATE'S ATTORNEY]: Yes, Your Honor.
>
> THE COURT: While Mr. Alexis has waived whatever conflict Mr. Tun might have, . . . Jalloh . . . has not and, in fact, takes significant exception to Mr. Tun continuing to participate in this case when [Jalloh], in fact, is going to be a witness for the State. The conflict is a significant one and I think we all agree there is, in fact, conflict. There is conflict with the duty of loyalty. I appreciate Mr. Tun represented [Jalloh] for a short period of time but, I think, that duty of loyalty continues and, in fact, there is really is truly a conflict were this case to go to trial with Mr. Tun at the table.
>
> To say that we can create a Chinese wall, a masonry wall, a brick or a block wall that solves this problem I think is folly. I just don't believe that we can do that. Having said all that, accordingly, I'm going to direct the Clerk to strike Mr. Tun's appearance.

*Id.* at 1250-51.

The trial court did not abuse its discretion in disqualifying Tun. After hearing from both parties, the trial court determined that Tun's duty of loyalty to Jalloh continued. As both the Court of Appeals and Court of Special Appeals acknowledged, "there was a conflict of interest that could not be cured . . . [and] the risk of conflict outweighed [Alexis's] right to counsel of choice." *Id.* at 1257; *Alexis*, 61 A.3d at 121. "Moreover, the trial judge 'was not required to

13

adopt use of co-counsel as a solution where the court perceived that the risk of conflict would persist.'" *Alexis*, 87 A.3d at 1257 (quoting *Alexis*, 61 A.3d at 121 and citing *United States v. Agosto*, 675 F.2d 965, 974 (8th Cir.1982) as "explain[ing] why appointment of co-counsel [for the purpose of cross-examination of a witness] is not always a cure-all").

The state courts' findings survive scrutiny. The Court of Appeals's affirmance of the trial court's discharge of Tun was based on a reasonable application of clearly established federal law as determined by the Supreme Court. *Wheat*, 486 U.S. at 164 (stating that a trial court "must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict"); *see also Basham*, 561 F.3d at 323 (noting that the Fourth Circuit has previously "upheld a district court's decision to disqualify counsel who had previously represented a witness at his current client's trial, *United States v. Williams*, 81 F.3d 1321, 1324-25 (4th Cir. 1996), and reversed for abuse of discretion a district court's failure to disqualify counsel who had represented the prosecution's "star witness" in a prior trial, *Hoffman v. Leeke*, 903 F.2d 280, 288-90 (4th Cir.1990)).

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant" in such cases. A certificate of appealability may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner must show that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Id.* at 478. Because Alexis has not made a substantial showing of a denial of his Constitutional rights and reasonable jurists would not debate the correctness of the procedural ruling in this case, which involved application of well-established case law, a certificate of appealability shall be denied. *See* 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the foregoing reasons, the Court will deny Alexis's Petition for Writ of Habeas Corpus and decline to issue a Certificate of Appealability. A separate order follows.

June 7, 2018  
Date

/s/  
Paul W. Grimm  
United States District Judge